MSF HOLDING LTD., Plaintiff,

v.

FIDUCIARY TRUST COMPANY
INTERNATIONAL,
Defendant.

No. 03 Civ. 1818(PKL).

United States District Court,
S.D. New York.

June 20, 2006.

Miller Nash, LLP, Portland, Oregon, John F. Neupert, Spencer L. Schneider, New York, New York, Spencer L. Schneider, for Plaintiff.

Jones Hirsch Connors & Bull P.C., New York, New York, Alan M. Gelb, Eugene P. Hanson, for Defendant.

## OPINION AND ORDER

LEISURE, District Judge.

Plaintiff MSF Holding Ltd. ("MSF") moves the Court, pursuant to Federal Rule of Civil Procedure 56, for an entry of summary judgment in its favor on its three causes of action against defendant Fiduciary Trust Company International ("FTCI") for the latter's alleged wrongful dishonor of a letter of credit under which plaintiff claims it is the beneficiary.[1] Plaintiff specifically alleges that defendant's dishonor constitutes a breach of contract and violation of Article 5 of New York's Uniform Commercial Code; plaintiff also seeks a

---

1. The Court will refer to letters of credit alternatively as "letters of credit" or "credits."

declaration that it is the proper holder of the letter of credit and that defendant has breached its terms by refusing to honor a draft made by plaintiff thereunder. Defendant cross-moves for summary judgment, arguing primarily that plaintiff lacks standing to enforce the credit. For the following reasons, plaintiff's motion is denied, and, while defendant's cross-motion is denied for failure to adhere to the requirements of Local Rule 56.1, the Court finds that defendant is entitled to judgment as a matter of law and summary judgment shall, therefore, be granted, *sua sponte,* in defendant's favor.

## BACKGROUND

### I. *Local Rule 56.1 Requirements*

Plaintiff has submitted with its motion for summary judgment, pursuant to Rule 56.1(a) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a separate numbered statement of material facts as to which it contends there are no genuine issues to be tried ("Rule 56.1 Statement"). S.D. & E.D. N.Y. R. 56.1(a). Defendant has properly submitted, pursuant to Local Rule 56.1(b), a counterstatement responding to each of plaintiff's assertions ("Rule 56.1 Counterstatement"). S.D. & E.D. N.Y. R. 56.1(b). Further, unless otherwise noted, the parties' respective assertions of undisputed and disputed material facts cite adequately to admissible evidence in the record. *See* Fed.R.Civ.P. 56(e); S.D. & E.D. N.Y. R. 56.1(d); *Giannullo v. City of N.Y.,* 322 F.3d 139, 140 (2d

Cir.2003) (" '[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.' " (quoting *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir.2001))). The parties' respective factual allegations, which are primarily drawn from those statements, follow below.

### II. *Factual History*

Plaintiff MSF is a Bahamian corporation with its principal place of business located outside the United States (Compl.¶ 1);[2] defendant FTCI is a New York corporation with offices in the Southern District of New York (Answer ¶ 4). Plaintiff alleges that Philips Medical Systems D.V. ("Philips"), a nonparty to this action, entered into a contract dated April 27, 1999, with Hospital Privado de Occidente C.A. ("HP"), also a nonparty to this action, pursuant to which Philips sold certain hospital equipment to HP (the "Philips Contract"). (Pl.'s 56.1 ¶ 2; Compl. ¶ 7.) Plaintiff alleges that HP, as part of its payment obligation under the Philips Contract, had defendant issue irrevocable letter of credit no. 649 ("LOC 649") in favor of Philips in the amount of $250,000 as partial security for HP's performance. (Pl.'s 56.1 ¶ 2.)

### A. *The Assignment of LOC 649*

The parties agree that in an Assignment Agreement dated March 23, 2001 ("Assignment Agreement"), Philips assigned to MSF–HSF Nederland B.V. ("MSF–HSF"), an affiliate of plaintiff's, its rights to a number of accounts receivable, which in-

---

**2.** The section of plaintiff's complaint invoking the Court's diversity jurisdiction states, *inter alia,* that plaintiff is a Bahamian corporation. All other allegations in the complaint are incorporated by reference from a complaint filed by plaintiff in a previous action in a Florida federal court, which litigation is discussed later in this section. The previous complaint contains an allegation, which is integrated by reference into the instant complaint, naming plaintiff as a corporation organized under the laws of Florida. Plaintiff's counsel has informed the Court on this motion that plaintiff is indeed a Bahamian corporation and that the allegation designating plaintiff as a Floridian corporation was a mistake.

cluded the receivables owed under the Philips Contract, as well as any additional sureties acquired by Philips in association with those receivables. (Pl.'s 56.1 ¶ 3; Def.'s 56.1 ¶ 3(a); Gelb Aff. Ex. H at Sixth & Seventh Whereas Clauses.) While plaintiff concedes that the assignment was made to its affiliate, MSF–HSF, plaintiff treats itself and MSF–HSF as identical identities, referring to the two interchangeably. (*See, e.g.,* Pl.'s 56.1 ¶ 3.) Defendant recognizes this and, consequently, disputes the fact that *plaintiff* is the assignee of LOC 649; instead, it differentiates between the two entities, claiming that MSF–HSF, as distinct from plaintiff, is the assignee of LOC 649. (Def.'s 56.1 ¶¶ 3(b)-(c).)

### B. *Plaintiff's Attempt to Draw Proceeds Under LOC 649*

On March 14, 2002, Mr. Fernando Rodriguez Lugo, a representative of "MSF de Colombia Ltda.," sought to draw the proceeds under LOC 649 by faxing[3] a copy of the credit to one of defendant's representatives.[4] (Pl.'s 56.1 ¶ 8.) By letter dated March 15, 2002, defendant denied Mr. Lugo's request on the ground that LOC 649 had been "cancelled upon our receipt of the original Letter of Credit from Philips Medical Systems B.V. on May 15, 2001. At no [point] was this Letter of Credit assigned prior to such cancellation or was a replacement Letter of Credit issued on

behalf of or [sic] MSF Holding Ltd. or any designee of Philips Medical Systems B.V." (Hamel Decl. Ex. 2; Pl.'s 56.1 ¶ 8.)[5] Defendant's reference to an "original Letter of Credit" refers to a letter of credit, numbered 101648, and dated May 21, 1999 ("LOC 648"), that defendant claims it issued in favor of Philips prior to issuing LOC 649. (Def.'s 56.1 ¶ 4(a).)

### C. *The Purported Prior Issuance of LOC 648*

Defendant contends that prior to issuing LOC 649, it issued LOC 648 to HP's agent, Vontobel USA Inc., on May 21, 1999. (Def.'s 56.1 ¶ 4(a).) Three days later, on May 24, 1999, defendant faxed a copy of LOC 648 and its attachments to Philips. (Def.'s 56.1 ¶ 4(a).) On June 1, 1999, a representative of defendant sent an e-mail to Vontobel, stating that, " '[w]e have been advised that Philips Medical Systems B.V. ("Philips") has not yet received Fiduciary Trust Company International's Irrevocable Letter of Credit No. 101648.' " (Def.'s 56.1 ¶ 4(b).) The e-mail advised that defendant would cancel LOC 648 and issue a replacement letter of credit if (1) Vontobel provided defendant with a signed written statement to the effect that Vontobel had been told by Philips that the latter had not received LOC 648, and that, therefore, Vontobel consented to the cancellation of LOC 648; and (2) Philips provided to defendant a written statement that it had not

---

**3.** The cover sheet to the facsimile shows that Manuel Perez, an employee of MSF Holding Ltd., was carbon copied on the facsimile transmission. (Neupert Decl. Ex. 2 at 1.)

**4.** Plaintiff claims that by March 2002, HP was "behind in its payments" and, as a result, plaintiff invoked its right to draw proceeds under LOC 649. (Pl.'s 56.1 ¶ 7.) Defendant claims that this assertion, which is derived solely from the declaration of plaintiff's counsel, John F. Neupert, Esq., is not grounded in any evidence in the record. (Def.'s 56.1 ¶ 7.)

The Court agrees and, therefore, the assertion will not be considered. The consideration of such a statement, however, is largely irrelevant given the parties' agreement elsewhere that a MSF-related entity did in fact seek to draw under LOC 649.

**5.** Defendant also asserts that its cancellation of the letter of credit is confirmed by an entry in defendant's records evidencing the reduction of the account to zero. (Def.'s 56.1 ¶ 8(b).)

received LOC 648, it had not assigned LOC 648 to any third party, and, if it were to receive LOC 648 at a later date, it would mark it cancelled and return it to defendant. (Pl.'s 56.1 ¶ 4; Garcia Aff. Ex. L.) [6] While plaintiff and defendant agree in their Rule 56.1 Statement and Rule 56.1 Counterstatement, respectively, that a letter written by Vontobel in satisfaction of the first condition has been produced in discovery, the letter is not located in the part of the record cited to by the parties, nor has the Court located the letter elsewhere in the record.[7] Consequently, the assertion that Vontobel in fact wrote the letter must be disregarded. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir.2003).

Neither party has produced a copy of a letter from Philips that would have satisfied defendant's second requirement for cancellation and reissuance of the credit. (Pl.'s 56.1 ¶ 6.) While the parties make various assertions concerning the efforts

6. Defendant responds in its Rule 56.1 Counterstatement that plaintiff's assertion of undisputed material fact is not admissible because it incorrectly paraphrases the June 1, 1999 e-mail. (Def.'s 56.1 ¶ 4(c).) However, the Court has reviewed the subject e-mail and plaintiff's assertion is supported by the language used therein.

7. The relevant statement in defendant's Rule 56.1 Counterstatement provides that "[a] letter in the form and substance required by Fiduciary's June 1, 1999 e-mail to Vontobel was sent to Fiduciary on June 1, 1999 by Vontobel." (Def.'s Rule 56.1 ¶ 5.) The exhibit cited to in support of this proposition, however, only contains defendant's e-mail to Vontobel instructing the latter on the two conditions to cancellation of LOC 648 and a second e-mail from defendant to a representative of Philips in which defendant explains—just as it had in its e-mail to Vontobel—that it required Philips to provide it with a written statement requesting cancellation of LOC 648. (Garcia Aff. Ex. L.) Missing from the exhibit is any correspondence from either Vontobel or Philips to defendant.

undertaken to locate a copy of the letter (*see* Pl.'s 56.1 ¶ 6; Def.'s 56.1 ¶ 6), the Court need not address them because, even in the event LOC 649 was properly issued in replacement of LOC 648, plaintiff lacks standing to draw under LOC 649 for the reasons discussed below.

**D. *Plaintiff's Presentment of LOC 649 to Defendant***

Plaintiff responded to defendant's letter to Mr. Rodriguez by having its counsel write to defendant seeking proof that LOC 649 had in fact been canceled. (Pl.'s 56.1 ¶ 8; Neupert Decl. Ex. 3.) Thereafter, an employee of plaintiff, Donna Hamel,[8] met with Susan Garcia, Esq., an in-house lawyer at FTCI, and other FTCI employees, in order to inspect LOC 649. Plaintiff claims that defendant's employees inspected LOC 649, and stated afterwards that it was genuine and, therefore, would be honored.[9] (Pl.'s 56.1 ¶ 9; Hamel Decl. ¶¶ 4–5.)

8. Donna Hamel worked for DVI Financial Services, Inc., an affiliate of plaintiff's. (Hamel Decl. ¶ 1.)

9. Defendant contests this assertion on the ground that plaintiff's reference to the cancellation of a letter of credit in its March 15, 2002 letter is contested because it is unknown whether the reference is to LOC 648 or LOC 649. (Def.'s 56.1 ¶ 9(a).) It further contends that, *inter alia*, Ms. Garcia only told plaintiff that the document *appeared to be an original* (and did not claim that it was genuine), and that defendant would require full compliance with customary documentation standards to support plaintiff's contention that the letter of credit had been assigned by Philips to plaintiff. (Def.'s 56.1 ¶ 9(b); Garcia Aff. ¶ 25.) Defendant further points out that at the time of the meeting between plaintiff's and defendant's representatives, plaintiff had not disclosed to defendant the existence of the Assignment Agreement. (Def.'s 56.1 ¶ 9(b); Garcia Aff. ¶¶ 19–20.) Had Ms. Garcia been aware of the Assignment Agreement's existence, defendant would not have even agreed to discuss honoring LOC 649 in the first

## E. *Defendant's Purported Repudiation of LOC 649*

Thereafter, on August 6, 2002, Ms. Garcia provided plaintiff with written instructions on what plaintiff needed to present to defendant under LOC 649 in order to receive payment. (Pl.'s 56.1 ¶ 10; Hamel Decl. Ex. 3.) Accordingly, on September 12, 2002, plaintiff presented defendant with LOC 649 and a request for a replacement credit. (Pl.'s 56.1 ¶ 10; Hamel Decl. Ex. 4.) In response, defendant claims that Ms. Garcia's instructions were induced by plaintiff's "fraudulent concealment" of the existence of the Assignment Agreement. It argues that the existence of the agreement eviscerates plaintiff of the "ownership or authority" to transfer LOC 649. (Def.'s 56.1 ¶ 10(a), (c).) Plaintiff alleges that defendant repudiated its obligations under LOC 649 when, by letter dated October 7, 2002, Ms. Garcia informed Ms. Hamel that, after investigation, defendant had not found any record of issuance of LOC 649 and that it only had a record of issuing a previous letter of credit to Philips as a beneficiary in May 1999, which credit had been cancelled in May 2001. (Pl.'s 56.1 ¶ 10; Def.'s 56.1 ¶ 10(c); Hamel Decl. Ex.

4.) Thus, defendant declined to issue a new letter of credit with plaintiff as beneficiary. (Pl.'s 56.1 ¶ 10(c); Hamel Decl. Ex. 4.)

In a letter dated October 21, 2002, plaintiff's counsel wrote to Ms. Garcia, seeking reconsideration of defendant's prior dishonor of LOC 649.[10] (Pl.'s 56.1 ¶ 11; Hamel Decl. ¶ 9, Ex. 6.) Plaintiff avers that its counsel spoke to Ms. Garcia on May 1, 2002, during which conversation Ms. Garcia explained that defendant's electronic files showed that LOC 649 had been canceled and the collateral for the credit had been released. (Pl.'s 56.1 ¶ 12; Bloom Decl. ¶ 2.) Plaintiff claims that Ms. Garcia stated that LOC 649 could only be canceled "(1) if [the] original LOC 649 was returned; (2) if the beneficiary stated in an affidavit that the obligation had been satisfied and permitted cancellation of LOC 649; and (3) some variation of (1) and (2), in which all interested parties agreed to cancel LOC 649." (Pl.'s 56.1 ¶ 12; Bloom Decl. ¶ 2.) It further claims that Ms. Garcia asked for time to perform due diligence, indicating that if defendant had erred, "it would pay for LOC 649, 'since this is what they have insurance for.'"[11] (Pl.'s 56.1 ¶ 12; Bloom Decl. ¶ 2.)

place. (Def.'s 56.1 ¶ 9(b); Garcia Aff. ¶¶ 19–20.)

**10.** Plaintiff's Rule 56.1 Statement incorrectly cites to paragraph 10 of Ms. Hamel's declaration in support of this proposition. Because proper support has easily been found in paragraph 9 of Ms. Hamel's declaration, which in turn cites to the letter itself, located at Exhibit 6 of the same declaration, this assertion of fact is properly considered by the Court on this motion. *Cf. Giannullo v. City of N.Y.,* 322 F.3d 139, 140 (2d Cir.2003) ("In the instant case, as in *Holtz,* the record does not support certain critical assertions in the defendant's Rule 56.1 statement on which the district court relied....").

**11.** Plaintiff also claims that the handwritten notes of an employee of defendant, dated October 3, 2002, that have been produced dur-

ing discovery state, *inter alia,* that "'we asked Babtista [sic] to return the 250K (of 296K) to FTCI *so that we may honor* the LC to Philips.'" (Pl.'s 56.1 ¶ 14; Neupert Decl. Ex. 4.) According to defendant, plaintiff claims, Mr. Baptista is an investor in HP who refused to return the collateral for LOC 649. (Pl.'s 56.1 ¶ 14; Neupert Decl. Ex. 4.) Defendant disputes the assertions concerning Mr. Baptista's notes, arguing that (1) the notes only confirm Mr. Baptista's admission that "LOC represented *his* debt to Philips, and that he 'acknowledged that debt'"; (2) the request that Baptista return the $250,000 was made so that defendant could "honor the underlying obligation *on Baptista's behalf* with *his* payment, and not its own"; and (3) Baptista did not refuse to return the collateral, but instead conceded that he believed Vontobel was to have Paine Webber issue a new letter of credit to Philips and that Paine Webber lost the

Defendant did not honor LOC 649 and plaintiff brought suit in Florida state court on January 31, 2003. (Pl.'s 56.1 ¶ 11; Answer ¶ 48.) The action was removed to the United States District Court for the Southern District of Florida, and that action was discontinued without prejudice by Order dated March 12, 2003. (Pl.'s 56.1 ¶ 11; Def.'s 56.1 ¶ 11(c); Gelb Aff. Ex. B.)

## DISCUSSION

Because plaintiff and defendant are Bahamian and New York corporations respectively, and because the damages alleged exceed $75,000, the Court finds that its subject matter jurisdiction has been properly invoked. *See* U.S. Const. art. III, § 2; 28 U.S.C. § 1332(a)(1), (c)(1) (2000); *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir.2005).

### I. *Summary Judgment Standards*

The summary judgment tool is designed to " 'discover whether one side has no real support for its version of the facts,' and thereby to avoid unnecessary trials." *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969) (quoting *Cmty. of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir.1962)); *see also IBM Poughkeepsie Employees Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 590 F.Supp. 769, 771 (S.D.N.Y.1984) (Weinfeld, J.) ("[O]ur Court of Appeals has recognized that, 'properly employed, summary judgment is a useful device for unmasking frivolous claims and putting a swift end to meritless litigation.' " (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980))). Federal Rule of Civil Procedure 56 provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Whether a fact in a given case is material is determined by looking at the applicable substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material."); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993) ("These procedural rules governing the use of summary judgment cannot properly be applied without examining the substantive law applicable in the underlying litigation since that law dictates which facts are material in a given case.").

The party moving for summary judgment bears the burden of demonstrating that no genuine factual dispute of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("As the moving party, respondent had the burden of showing the absence of a genuine issue as to any material fact...."); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004) ("The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment...."). " '[I]n assessing the record to determine whether there is a genu-

---

$250,000 " 'gambling.' " (Def.'s 56.1 ¶ 14.) Defendant also concedes that it does not maintain insurance governing the claims in this dispute. (Def.'s 56.1 ¶ 13.)

ine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.2005) (quoting *Sec. Ins. Co. of Hartford*, 391 F.3d at 83); *accord Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Indeed, "[t]o defeat summary judgment ... nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir.2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

██ Finally, "[i]n applying the above principles, the Court is mindful that '[a]ctions concerning letters of credit are well suited to determination by motion for summary judgment because they normally present solely legal issues relating to an exchange of documents.'" *Cooperative Agricole Groupement De Producteurs Bovins De L'Ouest v. Banesto Banking Corp.*, No. 86 Civ. 8921, 1989 WL 82454, at *2 (S.D.N.Y. July 19, 1989) (Leisure, J.) (quoting *Banque Worms, N.Y. Branch v. Banque Commerciale Privee*, 679 F.Supp. 1173, 1178 (S.D.N.Y.), *aff'd*, 849 F.2d 787 (2d Cir.1988)); *accord Ocean Rig ASA v. Safra Nat'l Bank of N.Y.*, 72 F.Supp.2d 193, 198 (S.D.N.Y.1999) ("Actions on letters of credit are well-suited to determina-tion on motions for summary judgment...."); *Bank of Cochin Ltd. v. Mfrs. Hanover Trust Co.*, 612 F.Supp. 1533, 1537 (S.D.N.Y.1985) ("Letter of credit liability cases are particularly appropriate for judicial resolution without trial because they present solely legal issues."), *aff'd*, 808 F.2d 209 (2d Cir.1986). *See generally* John F. Dolan, *The Law of Letters of Credit* § 11.06 (rev. ed. 2003) ("Courts often have held that disputes arising out of letters of credit present solely legal issues and are ripe for summary judgment.").

## II. Choice of Law

██ When this Court's subject-matter jurisdiction rests on the diversity of the parties, *see* 28 U.S.C. § 1332(a)(2) (2000), the Court is obligated to apply the choice-of-law rules of the state in which it sits— *viz*, New York. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, in the absence of fraud or a violation of public policy, a contract's express choice-of-law provision will be enforced, provided the law selected is that of a state with sufficient contacts to the transaction. *See, e.g., Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir.2000); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir.1996).

██ The choice-of-law provision in LOC 649 calls for application of the International Chamber of Commerce's Uniform Customs and Practice for Documentary Credits (1993 Revision), Publication No. 500 ("UCP") to its terms. It further states that, "as to matters not governed by the UCP," New York law should apply. Application of the UCP to a credit is wholly permissible and, indeed, quite common. *See, e.g., Ala. Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 816 (2d Cir.1992) ("[T]he UCP applies to most let-

ters of credit ... because issuers generally incorporate it into their credits."); *W. Int'l Forest Prods., Inc. v. Shinhan Bank,* 860 F.Supp. 151, 153 (S.D.N.Y.1994) ("Although the UCP is not law, it is made applicable by agreement of the parties to most letters of credit."). Nor is application of the UCP barred by the fact that it is not law.[12] *Ala. Textile Co.,* 982 F.2d at 816; *Shinhan Bank,* 860 F.Supp. at 153.

The parties' expressed intent to apply New York state law to those issues not addressed by the UCP is also permissible. While the parties do not address the issue in their briefs, the Court is required to apply New York law as it existed at the time the subject contract was made. *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,* 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) (" 'Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge.' " (quoting *Farmers & Merchs. Bank of Monroe v. Fed. Reserve Bank of Richmond,* 262 U.S. 649, 660, 43 S.Ct. 651, 67 L.Ed. 1157 (1923) (Brandeis, J.))); *2 Tudor City Place As-*

*socs. v. 2 Tudor City Tenants Corp.,* 924 F.2d 1247, 1254 (2d Cir.1991) (Lumbard, J.) ("Laws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein."); *Dolman v. U.S. Trust Co. of N.Y.,* 2 N.Y.2d 110, 157 N.Y.S.2d 537, 138 N.E.2d 784, 787 (1956) ("[U]nless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein.").[13] This principle is of particular importance to the interpretation of LOC 649 because Article 5 of New York's Uniform Commercial Code, which governs letter-of-credit transactions, has been materially altered since June 2, 1999, when a prior version of the article was in effect.[14]

The version of Article 5 in effect on June 2, 1999, expressly allowed the parties to a letter of credit to apply Article 5 to its terms. N.Y. U.C.C. § 5–102(4) (McKinney 1991) (current version at N.Y. U.C.C. § 5–103 (McKinney 2001)). In those instances where a letter of credit did not call for the application of New York state law, courts used the terms of Article 5 of the UCC to fill in the gaps left by the UCP: " 'When the UCP is silent or ambiguous, analogous

**12.** The International Chamber of Commerce has promulgated successive versions of the UCP over time. It consists of a set of rules fashioned by bankers for use in the banking industry. *See* John F. Dolan, *The Law of Letters of Credit* app. C intro. (rev. ed.2003). Interestingly, Article 1 of the UCP states that it shall apply to all letters of credit that incorporate its terms. Int'l Chamber of Commerce, Uniform Customs and Practice art. 1 (rev. ed.1993). The International Chamber of Commerce, of course, does not maintain the authority to obligate this Court to apply the UCP. *See* Dolan, *supra,* § 4.06[1] ("The first article of the Uniform Customs stipulates that the Customs govern all credits that incorporate them. This assertion of jurisdiction merits analysis, because ICC has no authority to

legislate."). This point notwithstanding, as stated above, courts in the Second Circuit—as well as other circuits—routinely enforce contracting parties' expressed intent to be bound by the terms of the UCP.

**13.** While the statutory law in place at the time of the contract's making is impliedly incorporated into a contract when the contract is silent on the issue, it applies, *a fortiori,* when, as is the case here, it is expressly incorporated therein.

**14.** Article 5 of the UCC was repealed and replaced with a new version effective as of November 1, 2000. 2000 N.Y. Laws c. 471.

UCC provisions may be utilized if consistent with the UCP.'" *Ala. Textile Co. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 822 (2d Cir.1992) (quoting *Bank of Cochin Ltd. v. Mfrs. Hanover Trust Co.,* 612 F.Supp. 1533, 1542 (S.D.N.Y.1985), *aff'd,* 808 F.2d 209 (2d Cir.1986)); *accord Brenntag Int'l Chemicals, Inc. v. Norddeutsche Landesbank GZ,* 9 F.Supp.2d 331, 343 n. 4 (S.D.N.Y.1998) (same); *Optopics Labs. Corp. v. Savannah Bank of Nigeria, Ltd.,* 816 F.Supp. 898, 909 (S.D.N.Y.1993) (same).

Finally, New York maintains sufficient contacts to the transaction by reason of, *inter alia,* defendant's physical location in New York, and New York serving as the geographical locale from which LOC 649 was issued. *See Int'l Minerals & Res., S.A. v. Pappas,* 96 F.3d 586, 592 (2d Cir. 1996).

## III. *Letter–of–Credit Doctrine*

### A. *General Principles*

■ A letter of credit " 'is a common payment mechanism in international trade that permits the buyer in a transaction to substitute the financial integrity of a stable credit source (usually a bank) for his own.'" *Bouzo v. Citibank, N.A.,* 96 F.3d 51, 56 (2d Cir.1996) (quoting *Ala. Textile Co.,* 982 F.2d at 815); *accord All Serv. Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A., N.Y. Branch,* 921 F.2d 32, 34 (2d Cir.1990) ("Generally, letters of credit are designed to substitute for, and therefore support, an obligation to pay."); *First Commercial Bank v. Gotham Originals, Inc.,* 64 N.Y.2d 287, 486 N.Y.S.2d 715, 475 N.E.2d 1255, 1258 (1985) ("[T]he credit subsumes a separate agreement by a buyer to pay money to a seller."). This commercial device is typically used when a seller of goods has identified a potential buyer but has reservations about the buyer's ability to pay.

In order to dispel the seller's concerns and effectuate the transaction, the buyer will request a bank to issue a letter of credit in favor of the seller, which the seller is entitled to draw on for payment. *Ala. Textile Co.,* 982 F.2d at 815. Consequently, the typical letter-of-credit transaction involves three independent relationships and transactions:

(1) an underlying commercial transaction between a buyer and a seller, (2) an agreement between a bank and its customer (the buyer), pursuant to which the bank agrees to issue a letter of credit supporting the buyer's obligations to the credit's beneficiary (the seller), and (3) the bank's resulting engagement to honor drafts or other demands for payment by the beneficiary, on the condition that the demand is accompanied by certain documents presented to the bank in conformity with the terms of the letter of credit.

*3Com Corp. v. Banco do Brasil, S.A.,* 171 F.3d 739, 741 (2d Cir.1999); *First Commercial Bank,* 486 N.Y.S.2d 715, 475 N.E.2d at 1258 (same). Parties to cross-border transactions are particularly inclined to use letters of credit because of the simplicity that derives from the independence of the three relationships at work:

"The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to honour a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued."

*Ala. Textile Co.,* 982 F.2d at 815 (quoting *Bank of Nova Scotia v. Angelica–Whitewear Ltd.,* [1987] D.L.R. 161, 166).

■■■ Of great importance to the letter-of-credit transaction is the fact that "the bank's payment obligation to the beneficiary is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction." *Voest–Alpine Int'l Corp. v. Chase Manhattan, N.A.,* 707 F.2d 680, 682 (2d Cir.1983); *accord First Commercial Bank,* 486 N.Y.S.2d 715, 475 N.E.2d at 1259 ("[T]he issuing bank's obligation ... is separate and independent from any obligation of its customer to the beneficiary under the sale of goods contract and separate as well from any obligation of the issuer to its customer under their agreement."). It is "[t]his independence principle [that] infuses the credit transaction with the simplicity and certainty that are its hallmarks." *Ala. Textile Co.,* 982 F.2d at 815. When the beneficiary of a credit presents to the bank-issuer the documents called for in the underlying credit, the bank-issuer's obligation to pay the beneficiary is triggered. *Id.* at 816; *Voest–Alpine,* 707 F.2d at 682; Int'l Chamber of Commerce, Uniform Customs and Practice art. 4 (rev. ed. 1993) ("In Credit operations all parties concerned deal with documents, and not with goods, services and/or other performances to which the documents may relate."). The beneficiary must strictly adhere to the letter of credit's requirements; the presentation of even slightly nonconforming documents will fail. *Ala. Textile Co.,* 982 F.2d at 816 ("There is no room for documents which are almost the same, or which will do just as well.") (internal quotation marks omitted); *Voest–Alpine,* 707 F.2d at 683 ("Documents nearly the same as those required are not good enough."). Likewise, if the documents presented do conform, the issuer's obligation to pay is absolute, regardless of whether the seller has in fact honored its sales agreement with the buyer-beneficiary. *Ala. Textile Co.,* 982 F.2d at 816; *First Commercial Bank v. Gotham Originals, Inc.,* 64 N.Y.2d 287, 486 N.Y.S.2d 715, 475 N.E.2d 1255, 1259 (1985).

## B. *Transfer and Assignment Under the UCP*

Defendant's primary argument in opposition to plaintiff's motion, and in support of its own cross-motion, presents a threshold, and ultimately dispositive, question for the Court to review. Defendant states that Philips "assigned" LOC 649 to MSF–HSF pursuant to the Assignment Agreement, thereby surrendering any interest it had in the credit to plaintiff's affiliate. As a result, defendant argues, plaintiff cannot now seek to enforce the credit. Plaintiff does not dispute that such an "assignment" was made; indeed, it claims to concede as much, instead arguing that plaintiff is nonetheless entitled to enforce the credit on MSF–HSF's behalf. As will be discussed in detail below, the parties have muddled the issue of what interest in LOC 649 was conveyed, if at all, to MSF–HSF by failing to recognize and apply the letter-of-credit precepts of assignment and transfer, doctrines that are unique to letters of credit and wholly distinct from common-law contract principles. *See generally* Dolan, *supra,* § 2.01, at 2–1 ("Problems in letter of credit law often arise when courts construe the credit as just another contract, albeit one with a peculiar nature."); *id.* § 2.02[1], at 2–4 ("[I]t is a cold court indeed that attempts to weather the storm of credit analysis with nothing more than general contract principles for warmth."). The Court turns to these principles and their application in this case.

■■■ Under the UCP, the beneficiary of a letter of credit may transfer the credit

to another, in which case the transferee, in effect, steps into the shoes of the beneficiary, thereby replacing it and becoming the party entitled to draw proceeds under the credit. *See* Int'l Chamber of Commerce, *supra,* art. 48. A beneficiary alternatively may assign its right to the proceeds of the credit, in which case the only change effectuated is that the assignee becomes the only party entitled to the proceeds of the credit, while the original beneficiary maintains all other rights and obligations under the credit, including the duty to present the necessary documentation to the issuer so that payment may be issued to the assignee. *See id.* art. 49; *Die–Matic Tool Co. v. Advanced Air Support Servs., Inc.,* No. 90 Civ. 7001, 1993 WL 764520, at *3 (S.D.N.Y. Mar.11, 1993) ("The distinction between transfer of a letter of credit and assignment of the proceeds is significant....."); *Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.,* 748 F.Supp. 177, 181–82 (S.D.N.Y.1990) ("The UCP–ICC distinguishes between 'transfer' of a letter of credit and 'assignment' of the proceeds. A transfer effectuates a more complete change."); *see also Inter Impex S.A.E. v. Comtrade Corp.,* No. 00 Civ. 0133, 2004 WL 2793213, at *3 (S.D.N.Y. Dec.6, 2004) (citing *Die–Matic Tool Co.* for same proposition). *See generally* Dolan, *supra,* § 10.01 ("Letter of credit law distinguishes between the transfer of the right to draw under a credit and the assignment of the right to take the credit proceeds."). Under the UCP, a letter of credit may only be transferred if it is "expressly designated as 'transferable' "; the use of terms to the effect that the credit is "assignable" does not make the credit transferable, and such terms should be disregarded. Int'l Chamber of Commerce, *supra,* art. 48(b); *see Algemene Bank,* 748 F.Supp. at 182 ("Such transfer may be made to a new substituted beneficiary only if the letter of credit is expressly designated as 'transferable' by the issuing bank.") (internal quotation marks omitted). On the other hand, the UCP follows common-law principles in that credits are freely assignable "in accordance with the provisions of the applicable law." Int'l Chamber of Commerce, *supra,* art. 49; *see Nassar v. Fla. Fleet Sales Inc.,* 79 F.Supp.2d 284, 293 (S.D.N.Y.1999) ("The UCP itself allows beneficiaries freely to assign the proceeds of a draw."); *Algemene Bank,* 748 F.Supp. at 182 ("Such assignments are commonplace."). *See generally* Dolan, *supra,* § 10.01 ("Credit law displays few reservations concerning the free alienability of the right to take the credit proceeds.").

IV. *Did the "Assignment Agreement" Transfer LOC 649 or Assign Its Proceeds to Plaintiff's Affiliate in 1999?*

A. *LOC 649's Restrictions on Transfer and Assignment*

 Because a letter of credit may not be transferred under the UCP where the credit's own terms restrict its transferability, *see* Int'l Chamber of Commerce, *supra,* art. 48(b), the Court turns to the language used in LOC 649. LOC 649 states that "[e]xcept as permitted hereunder, this Letter of Credit is not assignable or transferable." (Gelb Aff. Ex. J, 2.) In the following paragraph, the credit provides that "[t]his Letter of Credit may be assigned or transferred only to MSF Holding Ltd." upon the beneficiary's (1) execution of an "Agreement Assigning Irrevocable Letter of Credit," a sample of which is attached to the credit; and (2) the beneficiary's surrender to defendant of LOC 649 and a written request directing defendant to issue a *replacement* irrevocable letter of credit in favor of MSF Holding Ltd., reduced by the aggregate of all drawings previously made on LOC 649. (Gelb Aff. Ex. J, at 2.) These two conditions evince

what appears to be confusion about the differences between a transfer and assignment under the UCP. While the credit states that performance of the two conditions is to precede either an assignment or transfer, they solely concern the beneficiary's right to transfer the credit because they call for a new beneficiary to *replace* the original beneficiary and accede to all of its rights and obligations under the credit. *See Algemene Bank,* 748 F.Supp. at 182 ("A transfer effectuates a more complete change. The transferee is effectively substituted for the original beneficiary. After transfer, it is the transferee who must present the draft and documentation to cause payment."). The requirement that the original beneficiary enter into an "Agreement Assigning Irrevocable Letter of Credit" with the new beneficiary also evinces a transfer, notwithstanding its misleading title. Indeed, the "assignment" agreement to be executed calls for the original beneficiary's transfer of "all of its right, title and interest in and to" LOC 649, and the new beneficiary's acceptance of "all rights *and obligations* thereunder." (Gelb Aff. Ex. J, sched. 1.) An "assignment" under the UCP is an assignment of the proceeds to a credit; it does not include the transfer or delegation of any duties.

■ The terms of LOC 649, then, limit its transfer to one party—MSF Holding Ltd.—if the two enumerated conditions are met. The question whether Philips actually transferred LOC 649 to MSF–HSF under the Assignment Agreement, despite its misleading title, is easily answered in the negative. LOC 649, by its own terms, limits its transfer *solely to MSF Holding Ltd.* and no other party. Any attempted transfer to MSF–HSF, an entity distinct from plaintiff, fails, and the Court need not address whether the credit's two subsequent conditions on transfer were met.

*See* Int'l Chamber of Commerce, *supra,* art. 48(b). While a credit's restriction on transfer is strictly construed to preclude transfer to any party other than the named transferee, the UCP and New York state law does not so strictly construe restrictions on the assignment of a credit's proceeds.

B. *The UCP's Silence on the Mechanics of an Assignment of Proceeds and the Resulting Application of New York State's Uniform Commercial Code*

■ While the UCP is clear on the differentiation between a transfer and assignment of a credit, it is less than lucid on the mechanics of an assignment, and, indeed, is silent on the issue pertinent to the resolution of this motion, that is, whether the Assignment Agreement effectuated the assignment of LOC 649's proceeds to MSF–HSF. Courts faced with the application of the UCP and New York law have consistently held that, because the UCP is silent on when and how an assignment of proceeds is made, the more detailed terms of New York's UCC shall apply. *See Weyerhaeuser Co. v. Isr. Disc. Bank of N.Y.,* 895 F.Supp. 636, 645 (S.D.N.Y.1995) ("The parties agree that because the UCP is silent on the issue of when an assignment of proceeds vests, Section 5–116 of the New York Uniform Commercial Code governs the assignment of proceeds of letters of credit."); *Algemene Bank,* 748 F.Supp. at 183 n. 8 (looking to the UCC where "[t]he UCP–ICC is silent on the issue of when an assignment of proceeds vests"). *See generally* Dolan, *supra,* § 10.04[2] ("Article 49 of the Uniform Customs does not describe the method of effecting an assignment of proceeds, thereby suggesting that credit law is not concerned with those assignments beyond the point of encouraging them."); 7A Lary Lawrence, *Lawrence's Anderson on the Uniform*

*Commercial Code* § 5–116:18, at 395 (3d ed. 2001) ("UCC § 5–116 governs the assignment of letters of credit even though the letter is governed by [the] UCP since the UCP makes no provision on the subject.").[15] Consequently, per LOC 649's choice-of-law provision, the Court turns to New York state law to fill in the gap left by the UCP's silence on this issue.

Prior to November 1, 2000, section 5–116(2) of New York's Uniform Commercial Code governed a beneficiary's ability to assign its rights to the proceeds of a credit. N.Y. U.C.C. § 5–116(2) (McKinney 1991) (current version at N.Y. U.C.C. § 5–103 (McKinney 2001)). Section 5–116(2) provided as follows:

> (2) Even though the credit specifically states that it is nontransferable or non-assignable the beneficiary may before performance of the conditions of the credit assign his right to proceeds. Such an assignment is an assignment of an account under Article 9 on Secured Transactions and is governed by that Article except that
>
> (a) the assignment is ineffective until the letter of credit or advice of credit is delivered to the assignee which delivery constitutes perfection of the security interest under Article 9; and
>
> (b) the issuer may honor drafts or demands for payment drawn under the credit until it receives a notification of the assignment signed by the beneficiary which reasonably identifies the credit involved in the assignment and contains a request to pay the assignee; and
>
> (c) after what reasonably appears to be such a notification has been received the issuer may without dishonor refuse to accept or pay even to a person otherwise entitled to honor until the letter of credit or advice of credit is exhibited to the issuer.

*Id.*

The plain terms of the statute make clear that any purported assignment is ineffective until the letter of credit or advice of credit (the former in this action) is delivered to the assignee. The effect of such delivery "constitutes perfection of the security interest under Article 9." *Id.* § 5–116(2)(a). While at least one court has stated that delivery of the credit to the assignee *and* the issuer's receipt of a written notification of the assignment signed by the beneficiary are conditions precedent to the making of a valid assignment,[16] this

---

15. Notwithstanding this precedent, in one case from this district the court declined to apply the relevant state law—that of New York—in light of the UCP's silence on the issue of when an assignment vests in a new beneficiary. In *Optopics Laboratories Corp. v. Savannah Bank of Nigeria, Ltd.*, 816 F.Supp. 898, 905 (S.D.N.Y.1993), the court found that, "[a]s regards the assignability of the proceeds of a letter of credit, under New York law, the Court will enforce the provision of the UCP." Consequently, the court found that the UCP did not require prior notice to the issuing bank to effectuate an assignment; the original beneficiary's execution of an assignment agreement with the assignee, standing alone, was all the UCP required. *Id.* at 903; *see also* 7A Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 5–116:25, at 398 (3d ed.2001) (citing *Optopics* in support

of the proposition that "[u]nder the UCP there is no requirement that notice of the assignment be given to the issuer").

16. In that case, the court stated that

> UCC Section 5–116(2) provides that an assignment of the proceeds from a letter of credit becomes effective once (a) the letter of credit or advice of credit is delivered to the assignee and (b) the "issuer" receives notice of the assignment "signed by beneficiary which reasonably identifies the credit involved in the assignment and contains a request to pay the assignee."

*Weyerhaeuser Co. v. Isr. Disc. Bank of N.Y.*, 872 F.Supp. 44, 46 (S.D.N.Y.1994). Of course, even absent this Court's disagreement with the preceding statement, this Court is not bound by the holding of another district

Court disagrees.[17] In this Court's view, the wording of sub-section (b) does not condition the effectuation of an assignment upon notification to the issuer of the sought-after assignment; indeed, its plain terms seem to concede that an assignment has already been made prior to notification: "[T]he issuer may honor drafts or demands for payment drawn under the credit until it receives a notification *of the assignment* signed by the beneficiary which reasonably identifies the credit involved in the assignment and contains a request to pay the assignee." *Id.* § 5–116(2)(b). The purpose of this rule is not to condition the effectuation of the underlying assignment; it instead, at least in part, serves to protect an issuer from double payment.[18]

court. *Richardson v. Selsky*, 5 F.3d 616, 623 (2d Cir.1993) ("[A] district court decision does not 'clearly establish' the law, even in its own circuit.").

17. The views of various authoritative commentators in this area of the law support the Court's position: "[A]n assignee of the credit's proceeds must deliver the letter of credit or advice of credit to the assignee in order for the assignment to be effective; *that delivery constitutes perfection of the security interest.*" Dolan, *supra*, § 10.04[2][a] (emphasis added) (footnote omitted); *see also id.* § 10.03[2] ("Delivery of the credit document effects attachment and enables the secured party to satisfy the issuer that, in fact, *the assignment has been made.*") (emphasis added); *id.* ("Section 5–116(2) contains specific rules for notifying the credit issuer in the event the beneficiary assigns proceeds and generally treats the issuer as the Code treats an account debtor. Thus, under the Section the issuer may pay the original beneficiary until it receives notice of the assignment."); Lawrence, *supra*, § 5–116:18, at 396–97 ("An assignment of an account is not effective until the letter of credit or advice of credit is delivered to the assignee. Delivery to the assignee also constitutes perfection under Article 9 of the assignee's security interest in the proceeds."). Further, Professors White and Summers have stated that,

[r]egardless of the type of credit, section 5–116(2) provides that the beneficiary can 'assign his rights to proceeds' if done before performance of the conditions of the credit. This assignment is effective and perfected (for purposes of Article 9) when the letter is delivered to the assignee. Once an assignment is made and the issuer notified, the issuer is obligated to pay the assignee. The assignment of proceeds does not require approval by the issuer.

3 James J. White & Robert S. Summers, *Uniform Commercial Code* § 26–12, at 194 (4th ed.1995). They further enforce the notion that notification of an assignment to an issuer is not a condition precedent to satisfaction of the assignment by noting that "[s]ection 5–116(2) allows the assignee to protect itself against assignor double-dealing. By the terms of that section the assignee of proceeds may take possession of the letter of credit and send notice of the assignment (signed by the beneficiary) to the issuer." *Id.* § 26–12, at 196.

18. The Official Comment to section 5–116 states that

the special nature of the letter of credit as evidence of the right to proceeds is recognized by the additional requirement of delivery of the letter to the assignee as a condition precedent to the perfection of the assignment. Similarly, the fact that letters of credit normally require presentation of drafts or demands for payment which are drawn under it and that as a result notice of assignment of proceeds can exist simultaneously with a draft payable by order or indorsement to either the beneficiary or another third person leads to the necessity for permitting an issuer to protect itself against double payment by requiring exhibition of the letter or advice of credit.

N.Y. UCC § 5–116 cmt. 3 (McKinney 1991); *see also* 3 James J. White & Robert S. Summers, *supra*, § 26–12, at 196 ("[T]here are risks of assignor double-dealing. After making the assignment the assignor might procure forged documents, negotiate or present them with a properly drawn draft to a third party or to the issuer, and pocket the entire proceeds.").

C. *The Assignment Agreement Effectuated an Assignment of LOC 649's Proceeds*

■ Under the UCC, therefore, a credit's own restriction on the assignability of its proceeds is void, provided an assignment is made and the credit is delivered to the assignee. However, the statute does not define when or how such an assignment of proceeds is made. The parties both imprecisely "concede" that the Assignment Agreement effectuated an "assignment" of LOC 649, rather than an assignment of its proceeds. Regardless, the Court finds that because the question of whether a contract effectuates an assignment—either the assignment of a contract or the assignment of proceeds under a letter of credit—involves the construction of the contract, that question is one purely of law for the court to decide. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1147–48 (2d Cir.1992) ("The proper interpretation of a contract is a question of law for the court."); *Nat'l City Bank of N.Y. v. Schinasi*, 24 Misc.2d 444, 200 N.Y.S.2d 244, 248 (1960) ("It may be suggested that the construction of the assignment—a written document—is a question of law for the court . . . ."); *see also Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 278 (2d Cir. 1967) (stating the purpose of summary judgment is to, *inter alia*, "determine what, if any, issues of fact are present for the jury to determine, and enable the court to give judgment on the issues of law where no disputed issues of fact are found") (internal quotation marks omitted); *Empire Elecs. Co. v. United States*, 311 F.2d 175,.179 (2d Cir.1962) ("The problem besetting courts lies in defining what is or what is not an 'issue of material fact.' ").

■ Given their "concession," the parties have not made any arguments regarding the enforcement of the Assignment Agreement or any of its terms, including its choice-of-law clause, which calls for Dutch law to govern the agreement. Federal Rule of Civil Procedure 44.1 [19] governs a party's right to raise an issue that it believes will implicate the application of a foreign law, and, subsequently, the means by which the party may inform the court of the matter. Fed.R.Civ.P. 44.1; *see Clarkson Co. v. Shaheen*, 660 F.2d 506, 512 n. 4 (2d Cir.1981) (Lumbard, J.) ("Fed. R.Civ.P. 44.1 requires parties to give written notice, in the pleadings or otherwise, of their intention to assert foreign law."). In the Second Circuit, where parties fail to raise the issue of the applicability of a foreign law to a particular issue, a district court may choose to apply the law of the state in which it sits. *See, e.g., Clarkson Co.*, 660 F.2d at 512 n. 4 ("Here, none of the parties claimed the applicability of Canadian law or asserted that it differs from that of New York. Each seems to have assumed that New York law governs. Hence, the district court was not obligated to take judicial notice of Canadian law and correctly applied forum law.").[20]

---

**19.** The text of the Rule reads as follows:
A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed.R.Civ.P. 44.1.

**20.** *See also Motorola Credit Corp. v. Uzan*, 274 F.Supp.2d 481, 501–02 & n. 9 (S.D.N.Y.2003) ("[D]efendants have also waived their right to seek application of foreign law by failing to comply with Rule 44.1."); Restatement (Second) of Conflicts § 136 cmt. h (1971) ("[W]here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide

The Assignment Agreement clearly assigns to MSF–HSF a number of receivables, including the "[c]ontract of sale" between Philips and HP. (Gelb Aff. Ex. H at sched. 1.) It further states that Philips has, in certain cases, been granted additional sureties by its respective obligors and that the "[p]urchaser [i.e., MSF–HSF] wishes to have such additional sureties assigned to it by the Seller [i.e., Philips]." (Gelb Aff. Ex. H at sched. 1.) LOC 649 is not explicitly named as such an additional guaranty anywhere in the agreement. The question before the Court, then, is whether the contract's language concerning the assignment of any sureties obtained by Philips was meant to include LOC 649 and, more specifically, the right to the proceeds thereunder.

Under New York law, "[w]hen the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). While the language implies a broad assignment—the assignment of *any* "additional sureties" obtained by Philips—the Court cannot, as a matter of law, find that the agreement unambiguously assigned the right to LOC 649's proceeds to MSF–HSF. *See, e.g., Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir.2000) (Sotomayor, J.) ("Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.") (internal quotation marks omitted). However, the parties have pointed to extrinsic evidence in the record that evinces their intent. A court's review of evidence extrinsic to the terms of a contract itself is permissible on a summary judgment motion where, as here, such evidence demonstrates that no genuine issue of material fact exists. *See Compagnie Financiere,* 232 F.3d at 158 ("Although generally interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder, 'the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary.'" (quoting *3Com Corp. v. Banco do Brasil, S.A.,* 171 F.3d 739, 746–47 (2d Cir.1999) (citation omitted) (bracket in original))); *Shepley v. New Coleman Holdings Inc.,* 174 F.3d 65, 72 (2d Cir.1999) (stating that the relevant inquiry on a summary judgment motion concerning contract interpretation is one "that obtains not only when the language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law" (quoting *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 299 & nn. 9–11 (S.D.N.Y.1997), *aff'd,* 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998))); *Lee v. Marvel Enters., Inc.,* 386 F.Supp.2d 235, 243–44 (S.D.N.Y.2005) (citing *Shepley* for same proposition).

The extrinsic evidence before the Court is so one-sided as to dispel any dispute of

the case in accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interests of justice."); 9 *Moore's Federal Practice* § 44.1.03[2] (3d ed. 2006) ("Most courts have held that Rule 44.1 does not oblige the courts to determine foreign law on their own when it has not been brought into issue by the parties."). The Court thus applies New York state law to the interpretation of the Assignment Agreement.

the parties' intent: plaintiff admits that, after execution of the Assignment Agreement, LOC 649 was physically delivered by Philips to MSF–HSF along with the other assigned documents. (Gelb Aff. Ex. F (Brinkman Tr.) 39–40.) Plaintiff further admits that the Assignment Agreement conferred to MSF–HSF the receivables due and owing to Philips and "their security for that amount." (Gelb Aff. Ex. F (Perez Tr.) 111.) The Court finds that these admissions evidence an assignment of proceeds under LOC 649 in satisfaction of the UCC's requirement that (1) an assignment of proceeds be made and (2) the subject credit be delivered to the assignee. N.Y. U.C.C. § 5–116(2) (McKinney 1991) (current version at N.Y. U.C.C. § 5–103 (McKinney 2001)).

The effect of Philips's effective assignment of LOC 649's proceeds to MSF–HSF is, therefore, clear: MSF–HSF retained, as of the date of the assignment, a right— in the form of a security interest—to the proceeds of LOC 649, while Philips remained obligated to draw the proceeds from defendant in MSF–HSF's favor. Under the UCC, the original beneficiary— Philips—loses its right to present drafts under the credit, or, as here, transfer the credit to another—i.e., plaintiff. *See* N.Y. UCC § 5–116(3) (McKinney 1991) ("Except where the beneficiary has effectively assigned his right to draw or his right to proceeds, nothing in this section limits his right to transfer or negotiate drafts or demands drawn under the credit.").

V. *Plaintiff Is Foreclosed from Enforcing LOC 649 on Behalf of MSF–HSF*

 Plaintiff goes on to argue that any prior assignment of LOC 649's proceeds to MSF–HSF notwithstanding, no "rule of law" exists that would prohibit MSF–HSF's "parent company"—i.e., plaintiff—from enforcing LOC 649 on

MSF–HSF's behalf. (Pl.'s Reply Mem. Supp. Mot. & Opp'n Def.'s Cross–Mot. 7.) This assertion flies in the face of the myriad cases interpreting New York state law that uncontrovertibly refute this proposition: "Generally speaking, a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both." *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir.1993); *accord Darby v. Societe des Hotels Meridien*, No. 88 Civ. 7604, 1999 WL 459816, at *5 (S.D.N.Y. June 29, 1999) ("Generally, parent and subsidiary corporations are treated as separate legal entities, and a parent corporation is not liable for the acts of its subsidiaries."); *Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*, 861 F.Supp. 179, 181 (E.D.N.Y.1994) ("It is axiomatic that a plaintiff 'generally must assert his own legal rights and cannot rest his claim to relief on the legal rights or interests of third parties.' ") (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *Port Chester Elec. Const. Corp. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983, 986, (1976) ("Corporations, of course, are legal entities distinct from their managers and shareholders and have an independent legal existence. Ordinarily, their separate personalities cannot be disregarded."); 1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 43 (perm ed., rev. vol. 1999 & 2005 Supp.) ("As a general rule, two separate corporations are regarded as distinct legal entities. . . .").

 Consequently, plaintiff is not the real or proper party in interest to seek payment under the credit. Plaintiff's motion for summary judgment is therefore denied. Defendant has cross-moved for summary judgment on the ground that

plaintiff lacks standing to sue;[21] however, defendant has failed to comply with Local Rule 56.1, which requires a party moving for summary judgment to submit a separate statement of numbered material facts "as to which the moving party contends there is no genuine issue to be tried." S.D. & E.D. N.Y. R. 56.1(a). The failure to submit such a statement "may constitute grounds for denial of the motion." *Id.* While the Court denies defendant's cross-motion on the ground that it has not complied with the requirements of Local Rule 56.1, *see, e.g., Searight v. Doherty Enters., Inc.*, No. 02 Civ. 0604, 2005 WL 2413590, at *1 (E.D.N.Y. Sept.29, 2005) (denying defendant's summary judgment motion without prejudice "[s]ince Defendant has failed to submit the required 56.1 statement, the Court is unable to adequately assess whether there exist any genuine issues of material fact"), the Court recognizes at the same time that the parties do not dispute the fact that MSF–HSF is the assignee of LOC 649; they instead dispute its consequence under the law.

The Second Circuit recognizes a district court's right to grant summary judgment *sua sponte, see First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114 (2d Cir.1999) ("District courts are widely acknowledged to possess the power to enter summary judgment *sua sponte.*" (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986))); *Coach Leatherware Co. v. Ann-Taylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) ("Though not expressly authorized by Rule 56, this practice [of a district court granting summary judgment *sua sponte* ] has become an accepted method of expediting litigation."), but generally discourages the practice, *see Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir.2000) ("While it is not necessarily reversible error in our Circuit for a district court to grant summary judgment against the moving party without notice or opportunity to defend, we have firmly discouraged the practice.") (citation omitted); *see also Ramsey v. Coughlin*, 94 F.3d 71, 73–74 (2d Cir.1996) (" 'Care should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried ....' " (quoting James W. Moore, *Moore's Federal Practice* § 56.12, at 56–165 (2d ed.1995))), limiting its appli-

**21.** The Court writes to note that defendant has not raised a real-party-in-interest objection pursuant to Rule 17(a), *see* Fed.R.Civ.P. 17(a), instead moving for summary judgment on the ground that plaintiff lacks standing to sue. As discussed above, the Court finds that summary judgment in defendant's favor is appropriate because LOC 649 has been assigned to an entity other than plaintiff, and, therefore, plaintiff is foreclosed from enforcing LOC 649. At least one court in this district has characterized a similar scenario as one in which the plaintiff lacks standing to sue. *M.J.F.M. Kools v. Citibank, N.A.*, 872 F.Supp. 67, 72 (S.D.N.Y.1995). The Court simply writes to note that it recognizes the distinction between a plaintiff that is not the real party in interest and one who lacks standing to sue. For one, the latter doctrine is more often employed by courts in the realm of public law. 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1542, at 329–30 (2d ed.1990). The differences are slight, and the case law is muddled in that the doctrines are frequently used interchangeably. Indeed,

> it is not surprising that courts and attorneys frequently have confused the requirements for standing with those used in connection with real party in interest or capacity principles. The result has been the creation of what the Supreme Court has termed a "complicated specialty of federal jurisdiction" and the development of a doctrine that one prominent scholar has criticized for its "inconsistency, unreliability, and inordinate complexity."

*Id.* at 330–31 (footnotes omitted).

cation only to situations in which the non-movant is on sufficient notice of, and given adequate time to oppose, the possibility of summary judgment being entered against it, *see Ramsey*, 94 F.3d at 74 ("[W]e have held that 'summary judgment should not be granted ... unless the losing party has been given an opportunity to demonstrate that there are genuine material issues for trial.'" (quoting *Hispanics for Fair and Equitable Reapportionment v. Griffin*, 958 F.2d 24, 25 (2d Cir.1992) (per curiam))).

■ The present procedural setting is ripe for the entry of summary judgment because the party against whom summary judgment will be entered has both been put on notice of the possibility of entry of summary judgment and has had the opportunity to oppose it. Plaintiff was clearly put on notice of this possibility by reason of defendant's cross-motion on the ground that plaintiff lacked standing to bring this suit. It was given a fair opportunity to respond, and consequently did so respond in its reply brief in support of its motion and in opposition to defendant's cross-motion.[22] While defendant's cross-motion has been denied because of its technical failures, plaintiff, understandably, could not foresee the Court's denial on this ground and, accordingly, opposed the motion vigorously. The heart of plaintiff's opposition is that it does not dispute defendant's assertion that MSF–HSF is the true assignee of LOC 649; indeed, it wholeheartedly agrees with defendant, instead arguing that this fact is of no legal consequence because it can bring suit on MSF–HSF's behalf. Where parties on a summary judgment motion do not dispute a dispositive material fact, and merely disagree as to the consequence of that undisputed fact under the law, a question of law is presented for the court's interpretation and the court could not be on firmer ground in granting summary judgment as a matter of law. *Ramsey*, 94 F.3d at 74 ("Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law."); *Jackson v. Nassau County Bd. of Supervisors*, 818 F.Supp. 509, 535 (E.D.N.Y.1993) (" 'The grant of summary judgment for the nonmoving party clearly is proper if both sides agree that there are no material fact issues ....'" (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* § 2720, at 346 (3d ed.1998))). Consequently, the Court enters summary judgment in favor of defendant.

The Court notes, however, that it has not decided the merits of plaintiff's claim, and that, without addressing any defense defendant may have in a subsequent suit, MSF–HSF may be able to bring suit against defendant for enforcement of the credit. *See M.J.F.M. Kools v. Citibank, N.A.*, 872 F.Supp. 67, 72 (S.D.N.Y.1995).[23]

---

**22.** Notwithstanding defendant's failure to submit a Rule 56.1 Statement in support of its cross-motion, plaintiff also submitted a Rule 56.1 Counterstatement that responds to the statement filed by defendant in opposition to plaintiff's underlying motion. While this clearly reflects the fact that plaintiff was on notice of the cross-motion, it will not be considered by the Court, as plaintiff urges it to, as a kind of reply statement under Local Rule 56.1 because the rule does not provide for such reply statements.

**23.** In *M.J.F.M. Kools v. Citibank, N.A.*, 872 F.Supp. 67, 72 (S.D.N.Y.1995), the court granted defendant issuer's motion to dismiss plaintiff's complaint on the ground that plaintiff lacked standing to sue for breach of a

## CONCLUSION

For the reasons set forth above, the parties' cross-motions for summary judgment are denied; however, the Court enters summary judgment, *sua sponte*, in favor of defendant.[24] The Court Clerk is ordered to close the case file, and any pending motions are mooted.

**SO ORDERED.**

letter-of-credit application. However, the court expressly noted that the merits of the claim had not been decided and, consequently, there was "no apparent reason" why the proper applicant, plaintiff's undisclosed principal, could not bring suit against defendant for enforcement of the subject letter-of-credit application.

24. Given the grounds upon which the Court has directed summary judgment in defendant's favor—i.e., the threshold issue of plaintiff's ability to enforce the credit given its prior assignment to a third party—the Court need not address the parties' other arguments concerning plaintiff's presentment of LOC 649, nor does the Court need to address plaintiff's motion to supplement the summary judgment record with materials that do not affect plaintiff's inability to enforce the credit.